UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------X Docket No.  05-CV-9489 (PAC)
JOSEPHINE HART,

                Plaintiff,

        -against-                             **COMPLAINT**
                                            **AND JURY DEMAND**

AXA FINANCIAL, AXA EQUITABLE LIFE
INSURANCE COMPANY,

                Defendants.
------------------------------------------------------------------------X

      **JOSEPHINE HART**, by her attorneys, Gabor & Gabor, as and for her Complaint and Jury Demand, respectfully alleges as follows:

      1.      At all times relevant hereto, plaintiff was and is a resident of the State of New York, and maintains a residence at 365 Ocean Avenue, Massapequa, New York 11758.

      2.      At all times relevant hereto, defendants were and are a company authorized to do business in New York State and maintains their principal offices at 1290 Avenue of the Americas, New York, New York 10104.

### JURISDICTION AND VENUE

      3.      Jurisdiction is conferred pursuant to Title VII of the Civil Rights Act of 1964 pursuant to 42 U.S.C. §§ 2000e(1) to 2000e(17) and as amended; and 42 USCS § 1981.  This Court has pendent and supplemental jurisdiction pursuant to 28 U.S.C. 1367 based upon plaintiff's claims of violations of the New York State and local Human Rights Law.

      4.      The defendants employ more than 15 persons at all times.

5. The plaintiff filed charges with the U.S. Equal Employment Opportunity Commission, (hereinafter, "EEOC"), alleging discrimination based upon race, retaliation and national origin.

6. The plaintiff received a "Right to Sue" letter from the U.S. Equal Employment Opportunity Commission on or about August 23, 2005. This action has therefore been commenced in a timely manner.

7. A copy of this Federal Court complaint has been served upon the New York City Commission on Human Rights and upon Corporation Counsel.

### FACTS

8. The plaintiff was born on July 8, 1959, and therefore is currently forty-six (46) years old.

9. The plaintiff is a Puerto Rican female.

10. The plaintiff was hired by the defendants on or about March 8, 1982.

11. The plaintiff worked for the defendants as a Manager, Human Resources Operations.

12. During the time that the plaintiff worked for the defendants, she worked at the facility located at 1290 Avenue of the Americas, New York, New York 10104.

13. Throughout the relevant time, the plaintiff performed her job in an exemplary manner.

14. The plaintiff's employment was terminated effective October 8, 2004.

15. Upon information and belief, the defendants have maintained a consistent policy

of treating minority employees in an unequal and disparate manner.

16. An example of the disparate manner in which minority employees are treated arose in or about January 2004, when the defendant recognized that Vincy Ma and Josephine Luciano were underpaid.

17. Vincy Ma is Asian and Josephine Luciano is Puerto Rican.

18. Susan Tarranto, a Senior Vice President who was responsible for Benefit Plans Design and Compensation, repeatedly treated the plaintiff in a condescending and belittling manner in the presence of colleagues. Upon information and belief, Tarranto did not treat Caucasian employees in a similar manner.

19. During the Spring and Summer of 2004, the plaintiff made several trips to the Syracuse offices to work on an SAP to PeopleSoft conversion. During these trips it was apparent that the Syracuse workforce consisted of no minority employees. The plaintiff's observation was later verbally confirmed by Vince LoGatto in a subsequent trip to the Syracuse office. This observation was also confirmed by other members of the Conversion Team.

20. The benefits and payroll people who worked for the defendant in New York City were extremely diverse below the management level.

21. During the Summer of 2004, Sue Tarranto wrote several condescending e-mails to the plaintiff. As a result, the plaintiff complained to Vince LoGatto, the Vice President of Human Resources OpS. Mr. LoGatto was the plaintiff's boss.

22. Mr. LoGatto agreed that the most recent e-mail that the plaintiff showed him from Tarranto was offensive. Mr. LoGatto consulted with Al Kump, his boss. The matter was then referred by Mr. LoGatto to Angela Conklin in Human Resources Relationship Management.

23.     In or about July 2004, Kip Condron, CEO of AXA Financial and Henri Decastres, CEO of AXA Group and the Chairman of AXA Financial, stated at an officers meeting that the company would not outsource to a non-AXA entity unless there was a clear and robust business case that proved to be a significant savings and a net savings of AXA jobs.

24.     In or about late August 2004, Jennifer Blevins, Executive Vice President of Human Resources, announced the outsourcing of Benefits to a non-AXA company (Hewitt Associates) and that Payroll and the remaining benefits positions would move to the Syracuse offices.

25.     In or about late August 2004, a follow-up meeting was held. At this time, the company announced that "stay bonuses" would be issued along with other incentives to encourage critical employees to remain through the conversion. It was announced that Al Kump, Vice President of Human Resources would be meeting with the "critical employees".

26.     In response to a direct question it was announced at the second meeting that no EEO impact analysis had been performed regarding the outsourcing to a non-AXA company of these positions because "no data had been made available".

27.     In late August 2004, Al Kump advised the plaintiff that her stay on bonus and other incentives would have to be approved by Sue Tarranto. The plaintiff expressed her frustration since Tarranto had clearly exhibited a bias against the plaintiff.

28.     Within one or two days of the plaintiff's meeting with Al Kump, she was contacted by Angela Conklin because of a false allegation that the plaintiff had refused to do her job. The false allegation was in retaliation of the plaintiff's complaint to Kump about the discrimination that she was subjected to by Tarranto.

29. The plaintiff met with Ms. Conklin and Vince LoGatto regarding the allegation that she was refusing to perform her job. The plaintiff advised them that she had been working extensive hours in the office and both Ms. Conklin and Mr. LoGatto agreed that the plaintiff was performing her job. The plaintiff was told that she would definitely receive a stay on bonus and other incentives.

30. During that same meeting, Conklin, LoGatto and the plaintiff also discussed the plaintiff's concerns regarding the manner in which Sue Tarranto had treated her and that Tarranto would have to approve any stay on bonus. The plaintiff explained that she felt that she was treated unfairly because she is a minority and that other minority employees were also treated unfairly. The plaintiff was advised that Barbara Kaplan-Newman, an attorney employed by Human Resources, would contact the plaintiff regarding her complaint.

31. In either very late August 2004, or early September 2004, the plaintiff met with Ms. Kaplan-Newman. The plaintiff provided Ms. Kaplan-Newman with copies of e-mails that she had received from Tarranto and explained her concerns regarding race discrimination in the workplace. Ms. Kaplan-Newman indicated that an investigation would be conducted and that Ms. Tarranto would not be made aware of the plaintiff's complaints unless it became necessary.

32. In late September or early October of 2004, the plaintiff had two (2) "wrap-up sessions" with Ms. Kaplan-Newman. The plaintiff advised Ms. Kaplan-Newman that she was concerned that her confidentiality had been breached and that she had been retaliated against as a result of her initial complaints of discrimination.

33. The plaintiff took a one (1) week vacation in early September. At that time, the plaintiff was under tremendous stress from the false allegation that she was not performing her

job, the investigation, the harassment and workload from the conversion.

34.     The plaintiff returned to work in or around the second full week of September 2004. Several events arose which led the plaintiff to believe that she was no longer welcome at AXA.

35.     The following events serve as examples of how the plaintiff was constructively forced to leave her employment with AXA:

a.     Individuals who the plaintiff had previously identified as being worthy of promotions that were withheld due to discriminatory animus were told that they were being given promotions while the plaintiff was on vacation and were told not to tell the plaintiff;

b.     After returning from vacation, which took place shortly after the plaintiff's meeting with Vince LoGatto and Angela Conklin, three (3) individuals, all minorities that the plaintiff had identified as not receiving market adjustments when warranted and were discussed with Conklin and LoGatto as part of the meeting that occurred in August, were told promotions had been approved. Two (2) of them were also told not to tell the plaintiff. Furthermore, two (2) were specifically told that this was not a market adjustment, it was a promotion, which led the plaintiff to conclude that it was carefully discussed in compensation and specific instructions on communications to these individuals were carefully orchestrated. The plaintiff had been trying to get these two (2) individuals promotions for about nine (9) months and was told that they were not approved;

c.     An officer of AXA came to the plaintiff's office shortly after the plaintiff's return from vacation asking her to assist on a matter of importance. When the plaintiff informed this officer that she was a bit tied up and she could get to it in about an hour; he warned the

plaintiff that this matter was for Sue Tarranto, and "you know how she is and why you have to do it right away";

      d.    A member of the plaintiff's unit was approached by a manager in Human Resources, Operations and told that on matters that he would normally go to the plaintiff with, that he would now have to go to a particular member of the plaintiff's staff, because "something is going on with Jo Hart";

      e.    The plaintiff's personnel folder was tampered with. Her last two (2) evaluations, both of which were very positive, had been removed. This made the plaintiff extremely concerned that she had been singled out;

      f.    Information regarding the stay bonus was withheld;

      g.    Employee Relations promised the plaintiff a response to her stay bonus request as soon as she returned from vacation. A formal response was never received;

      h.    Eventually, Vince LoGatto told the plaintiff in sum and substance that there were no stay bonuses for anyone. However, this seemed very inconsistent with his off-cycle promotion for the three (3) individuals referred to above as well as other promotions and stay bonuses that the plaintiff heard about later. It also is inconsistent with Jennifer Blevins' representation that stay bonuses were available;

      i.    The date for Job Abolishment was rescinded after a verbal approval and mutual agreement between an officer of AXA and Ms. Hart;

      j.    Since the plaintiff was eventually told "Stay Bonuses were eliminated" from the program entirely, she spoke to her boss, Vince LoGatto, about a job abolishment date of November 1, 2004. This would alleviate the considerable strain the plaintiff was under due to

the discrimination she was subjected to, would free her up to complete her required deliverables for the Conversion Project, and the plaintiff and her boss would be satisfied with the outcome. This would also entitle the plaintiff to a severance package under the AXA policy for job elimination. While this date was approved by Vince LoGatto (who told the plaintiff directly it was OK with him and later told her it was OK with Al Kump), and would have even resulted in saving AXA her salary by accelerating her job abolishment date, this agreement was voided by parties which have not been made known to the plaintiff;

      k.      The plaintiff is aware that AXA cut many similar deals in the past for other non-minority employees who were at or near her level;

      l.      It is well known that several White male officers and Agency Managers received job severance benefits after their official AXA announcement of resignation and a negotiation of job abolishment date. Upon information and belief, several other individuals also received packages and incentives;

      m.      While the plaintiff was told that there were no stay bonus or deals to stay, several other individuals, including Vince LoGatto, and Georgine Essel were promoted.

      n.      Essel had far less experience with AXA and had less education in the field. Essel is a White female;

      o.      The plaintiff was falsely accused of faking an illness;

      p.      After nearly ten (10) years of perfect attendance, the strain caused by the harassment took its toll on the plaintiff.  On one occasion, while the plaintiff was out, a staff member of hers was told by an Officer of AXA that Human Resources Management, in an effort to undermine the plaintiff's authority and credibility with her staff, that the Officer believed the

plaintiff was faking the sick day.  This was also intended to attempt to cause the plaintiff to resign her position;

q.   When the plaintiff came to work the next day, she visited AXA's medical department, who advised her to go home due to elevated blood pressure and a rapid pulse.  Nevertheless, the plaintiff worked the entire day.  The plaintiff showed her boss the medical documentation from AXA's Medical Department advising her to go home.  The plaintiff was not sent home even after showing the medical department release form.  The plaintiff told Mr. LoGatto that she was going to stay to further progress on the conversion project, which she did.  At this point, however, the plaintiff was becoming physically ill due to the stress at work;

r.   The plaintiff never received answers to questions regarding job postings, or the status of the business case which had been promised to her by Jennifer Blevins at one of the employee meetings held at AXA.  Ms. Hart followed up with Mr. Kump on this commitment but the business case was never given to her or members of her staff; and,

s.   The plaintiff was also aware that she was being singled out by receiving threats, she was not promoted, she was not offered a stay bonus or other package and she was constantly having her authority undermined.

36.   As a result, the plaintiff's employment was constructively terminated effective October 8, 2004.

37.   Due to the fact that the plaintiff was forced to leave her position, she lost any opportunity for a severance package, lifetime insurance and a stay package.

38.   AXA has a policy of paying its minority employees less than its White employees.

39. The entire policy of moving the department to Syracuse and by outsourcing jobs was discriminatory.

40. Although represented as company policy, no proper study was done in advance of the decision to outsource.

41. The plaintiff was subjected to retaliation for complaining about discrimination in the workplace.

42. This has caused the plaintiff to suffer severe economic and emotional damages.

**AS AND FOR A FIRST CAUSE OF ACTION
TITLE VII OF THE CIVIL RIGHTS ACT OF 1964 -
NATIONAL ORIGIN AND ETHNICITY**

43. The plaintiff repeats, reiterates, and realleges each and every allegation as contained in paragraphs 1 through 42 of the complaint with the same force and effect as if more fully set forth at length herein.

44. The plaintiff is a Puerto Rican female.

45. The plaintiff has suffered adverse employment action in that the defendants have wrongfully discriminated against the plaintiff by failing to promote the plaintiff, denying her the same opportunities as the White employees, and constructively discharging her from her position.

46. A motivating factor for the defendants' conduct is the plaintiff's national origin.

47. Upon information and belief, the plaintiff's position was outsourced in an effort to eliminate the minority employees from the department.

48. Said discrimination is unlawful pursuant to Title VII of the Civil Rights Act of 1964.

49. As a result of the defendants' unlawful actions, the plaintiff has lost income, has suffered damages to her reputation in the community and has suffered emotional damages.

50. The plaintiff has suffered economic and emotional damages in the sum of FIVE MILLION ($5,000,000.00) DOLLARS.

## AS AND FOR A SECOND CAUSE OF ACTION
## NEW YORK STATE EXECUTIVE LAW § 296 et seq. -
## NATIONAL ORIGIN AND ETHNICITY

51. The plaintiff repeats, reiterates, and realleges each and every allegation as contained in paragraphs 1 through 50 of the complaint with the same force and effect as if more fully set forth at length herein.

52. The plaintiff is a Puerto Rican female.

53. The plaintiff has suffered adverse employment action in that the defendants have wrongfully discriminated against the plaintiff by failing to promote the plaintiff, denying her the same opportunities as the White employees, and constructively discharging her from her position.

54. Upon information and belief, the plaintiff's position was outsourced in an effort to eliminate the minority employees from the department.

55. A motivating factor for the defendants' conduct is the plaintiff's national origin.

56. Said discrimination is unlawful pursuant to the New York State Executive Law §

296 et seq.

57. As a result of the defendants' unlawful actions, the plaintiff has lost income, has suffered damages to her reputation in the community and has suffered emotional damages.

58. The plaintiff has suffered economic and emotional damages in the sum of FIVE MILLION ($5,000,000.00) DOLLARS.

### AS AND FOR A THIRD CAUSE OF ACTION
### NEW YORK CITY ADMINISTRATIVE CODE § 8-107 -
### NATIONAL ORIGIN AND ETHNICITY

59. The plaintiff repeats, reiterates, and realleges each and every allegation as contained in paragraphs 1 through 58 of the complaint with the same force and effect as if more fully set forth at length herein.

60. The plaintiff is a Puerto Rican female.

61. The plaintiff has suffered adverse employment action in that the defendants have wrongfully discriminated against the plaintiff by failing to promote the plaintiff, denying her the same opportunities as the White employees, and constructively discharging her from her position.

62. Upon information and belief, the plaintiff's position was outsourced in an effort to eliminate the minority employees from the department.

63. A motivating factor for the defendants' conduct is the plaintiff's national origin.

64. Said discrimination is unlawful pursuant to the New York City Administrative Code §8-107.

65. As a result of the defendants' unlawful actions, the plaintiff has lost income, has suffered damages to her reputation in the community and has suffered emotional damages.

66. The plaintiff has suffered economic and emotional damages in the sum of FIVE MILLION ($5,000,000.00) DOLLARS.

### AS AND FOR A FOURTH CAUSE OF ACTION
### RACE DISCRIMINATION IN VIOLATION OF
### TITLE VII OF CIVIL RIGHTS ACT

67. Plaintiff repeats, reiterates and realleges the allegations contained in paragraphs numbered "1" through "66" of the Complaint with the same force and effect as if set forth more fully herein.

68. The defendants have discriminated against the plaintiff on the basis of plaintiff's race and color.

69. The plaintiff was subjected to a hostile work environment due to race and color.

70. The plaintiff's employment was constructively terminated due to race and color.

71. Race was a motivating factor for the adverse employment action taken against the plaintiff.

72. At all relevant times the plaintiff performed her duties in a satisfactory manner.

73. The hostile work environment was unwanted and unwelcome by the plaintiff.

74. A reasonable person would have found that the manner in which the plaintiff was treated was unreasonable.

75. The plaintiff has been caused to suffer severe economic and emotional damages as a result of this conduct.

76. The defendants have discriminated against the plaintiff with respect to her employment terms, working conditions and privileges of employment in violation of Title VII of the Civil Rights Act of 1964.

77. But for the plaintiff's race, the plaintiff would not have been subjected to discrimination.

78. As a result of the defendants' conduct, plaintiff has been damaged in the sum of FIVE MILLION ($5,000,000.00) DOLLARS.

### AS AND FOR A FIFTH CAUSE OF ACTION
### RACE DISCRIMINATION IN VIOLATION OF
### NEW YORK STATE EXECUTIVE LAW § 296

79. Plaintiff repeats, reiterates and realleges the allegations contained in paragraphs "1" through "78" of the Complaint with the same force and effect as if set forth more fully herein.

80. The defendants have discriminated against the plaintiff on the basis of plaintiff's race and color.

81. The plaintiff was subjected to a hostile work environment due to race and color.

82. The plaintiff's employment was constructively terminated due to race and color.

83. Race was a motivating factor for the adverse employment action taken against the plaintiff.

84. At all relevant times the plaintiff performed her duties in a satisfactory manner.

85. The hostile work environment was unwanted and unwelcome by the plaintiff.

86. A reasonable person would have found that the manner in which the plaintiff was

treated was unreasonable.

87. The plaintiff has been caused to suffer severe economic and emotional damages as a result of this conduct.

88. The defendants have discriminated against the plaintiff with respect to her employment terms, working conditions and privileges of employment in violation of New York State Executive Law § 296 et seq.

89. But for the plaintiff's race, the plaintiff would not have been subjected to discrimination.

90. As a result of the defendants' conduct, plaintiff has been damaged in the sum of FIVE MILLION ($5,000,000.00) DOLLARS.

**AS AND FOR A SIXTH CAUSE OF ACTION**
**RACE DISCRIMINATION IN VIOLATION OF**
**THE NEW YORK CITY ADMINISTRATIVE CODE § 8-107**

91. Plaintiff repeats, reiterates and realleges the allegations contained in paragraphs "1" through "90" of the Complaint with the same force and effect as if set forth more fully herein.

92. The defendants have discriminated against the plaintiff on the basis of plaintiff's race and color.

93. The plaintiff was subjected to a hostile work environment due to race and color.

94. The plaintiff's employment was constructively terminated due to race and color.

95. Race was a motivating factor for the adverse employment action taken against the plaintiff.

96. At all relevant times the plaintiff performed her duties in a satisfactory manner.

97. The hostile work environment was unwanted and unwelcome by the plaintiff.

98. A reasonable person would have found that the manner in which the plaintiff was treated was unreasonable.

99. The plaintiff has been caused to suffer severe economic and emotional damages as a result of this conduct.

100. The defendants have discriminated against the plaintiff with respect to her employment terms, working conditions and privileges of employment in violation of the New York City Administrative Code § 8-107.

101. But for the plaintiff's race, the plaintiff would not have been subjected to a hostile work environment and wrongful termination of employment.

102. As a result of the defendants' conduct, plaintiff has been damaged in the sum of FIVE MILLION ($5,000,000.00) DOLLARS.

### AS AND FOR A SEVENTH CAUSE OF ACTION
### IN VIOLATION OF TITLE VII - RETALIATION

103. Plaintiff repeats, reiterates and realleges the allegations contained in paragraphs "1" through "102" of the Complaint with the same force and effect as if set forth more fully herein.

104. A motivating factor for this adverse employment action was the plaintiff's complaints of discrimination.

105. The defendants' conduct was calculated to cause the plaintiff to quit her

employment with the defendants.

106. The defendants have wilfully discriminated against the plaintiff with respect to the conditions of the plaintiff's employment.

107. But for plaintiff's complaints of discrimination in the workplace, she would not have been the victim of this discrimination.

108. As a result of the defendants' conduct, plaintiff has been damaged in the sum of FIVE MILLION ($5,000,000.00) DOLLARS together with punitive damages in the sum of FIVE MILLION ($5,000,000.00) DOLLARS.

**AS AND FOR AN EIGHTH CAUSE OF ACTION
IN VIOLATION OF NEW YORK STATE EXECUTIVE LAW § 296  - RETALIATION**

109. Plaintiff repeats, reiterates and realleges the allegations contained in paragraphs "1" through "108" of the Complaint with the same force and effect as if set forth more fully herein.

110. A motivating factor for this adverse employment action was the plaintiff's complaints of discrimination.

111. The defendants' conduct was calculated to cause the plaintiff to quit her employment with the defendants.

112. The defendants have wilfully discriminated against the plaintiff with respect to the conditions of the plaintiff's employment.

113. But for plaintiff's complaints of discrimination in the workplace, she would not have been the victim of this discrimination.

114. As a result of the defendants' conduct, plaintiff has been damaged in the sum of FIVE MILLION ($5,000,000.00) DOLLARS together with punitive damages in the sum of FIVE MILLION ($5,000,000.00) DOLLARS.

### AS AND FOR A NINTH CAUSE OF ACTION
### IN VIOLATION OF NEW YORK CITY
### ADMINISTRATIVE CODE SECTION 8-107 - RETALIATION

115. Plaintiff repeats, reiterates and realleges the allegations contained in paragraphs "1" through "114" of the Complaint with the same force and effect as if set forth more fully herein.

116. A motivating factor for this adverse employment action was the plaintiff's complaints of discrimination.

117. The defendants' conduct was calculated to cause the plaintiff to quit her employment with the defendants.

118. The defendants have wilfully discriminated against the plaintiff with respect to the conditions of the plaintiff's employment.

119. But for plaintiff's complaints of discrimination in the workplace, she would not have been the victim of this discrimination.

120. As a result of the defendants' conduct, plaintiff has been damaged in the sum of FIVE MILLION ($5,000,000.00) DOLLARS together with punitive damages in the sum of FIVE MILLION ($5,000,000.00) DOLLARS.

## AS AND FOR A TENTH CAUSE OF ACTION
## 42 USCS § 1981

121.    Plaintiff repeats and reiterates and realleges the allegations contained in paragraphs "1" through "120" of the Complaint with the same force and effect as if set forth more fully herein.

122.    The defendants failed to promote the plaintiff, denied her the same opportunities as the White employees, and constructively discharged her from her position.

123.    The plaintiff's ethnicity played a part in the decision to discriminate against the plaintiff.

124.    As a result of the defendants' conduct, plaintiff has been damaged in the sum of FIVE MILLION ($5,000,000.00) DOLLARS.

## JURY DEMAND

125.    Plaintiff demands a jury trial of this action.

**WHEREFORE**, plaintiff demands judgment as follows:

a)    Declaring that the actions, patterns and practices of the defendants, their agents, servants and all those acting in concert with them, constituted, and does constitute, a violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. Section 2000e et seq.; as amended, the Civil Rights Act of 1991 (Pub. L. 102-166); 42 U.S.C. Section 1981; the New York State Constitution; the New York State Executive Law Section 290 et seq.; the New York City Administrative Code §8-102 et seq.; and all applicable rules and regulations, and common law principals.

b)    Permanently enjoining the defendants, their agents, servants and all those acting

in concert with them, from violating Title VII of the Civil Rights Act of 1964, 42 U.S.C. Section 2000e et seq.; as amended, the Civil Rights Act of 1991 (Pub. L. 102-166); 42 U.S.C. Section 1981; the New York State Constitution; the New York State Executive Law Section 290 et seq.; the New York City Administrative Code §8-102 et seq.; and all applicable rules and regulations, and common law principals.

      c)      Awarding damages for economic and emotional injuries as well as interest, costs, disbursements, common law, statutory, compensatory, exemplary and punitive damages, pre-judgment interest, pecuniary and non-pecuniary damages and such other and further relief as to this Court deems just and proper; and,

      d)      Awarding counsel fees, costs and disbursements of this action.

Together with such other and further equitable relief which as to this Court may seem just and proper.

Dated: Garden City, New York
       November 8, 2005

      Yours etc.,

      /s/
DAVID G. GABOR (DGG 9979)
GABOR & GABOR
Attorney for Plaintiff
400 Garden City Plaza
Suite 406
Garden City, New York 11530
(516) 248-2525